ELIZABETH MOON, Respondent, v. MARTIN STATE BANK, a Corporation, Appellant.

(230 N. W. 11.)

Opinion filed March 25, 1930.

*Peter A. Winter,* for appellant.

*John O. Hanchett,* for respondent.

354

BURR, J. In her complaint the plaintiff says: that through the fraud, misrepresentations and deceit of the defendant she was induced to trade to the bank certain residence property in the village of Martin for a quarter section of land in the county of Sheridan; that she believed the representations made and relied thereon; that as soon as she discovered the fraud practiced upon her she demanded a reconveyance of the residence property to her, with an offer to reconvey to the defendant the farm lands received; and that defendant refused to do so. For this reason she asks the court to compel the defendant to reconvey

the residence property to her and account for and pay over to her the rentals received from the residence property together with the amount of the mortgages on the farm land paid by her, with interest. The defendant denies fraud, misrepresentations and deceit.

The case was submitted to a jury who were required to make special findings; the questions submitted and the decision of the jury thereon, being as follows:

"Q. Were the statements in defendant's letter regarding the land untrue? A. Yes.

"Q. Did defendant then know same to be untrue? A. Yes.

"Q. Did defendant intend to deceive the plaintiff or induce her to enter into the contract by said statements? A. Yes.

"Q. Did plaintiff actually trade with defendant relying upon such statements? A. Yes."

The court thereupon made findings of fact based upon this special verdict and the undisputed facts in the case, conclusions of law in harmony therewith, and entered judgment for the plaintiff requiring the defendant to reconvey the residence property to the plaintiff, accept the re-conveyance of the farm land, and pay to the plaintiff in addition thereto the sum of $413.58 and the costs of the action.

A motion for a new trial was made and denied and the defendant appeals from the order denying the motion for a new trial and from the judgment entered in the case.

The specifications of error are seven in number and are confined to the three general propositions: First, that there is no fraud, misrepresentation or deceit shown; second, that plaintiff did not commence her action within a reasonable time after she "became suspicious of the transaction with the defendant and thought that there was something wrong" and though she thus became suspicious in the year 1924 "she did not make any investigation until the year 1928, four years later, and that had she investigated the matter in 1924 she would have discovered all the alleged fraudulent statements made by the defendant;" and third, that the amount allowed to the plaintiff is not justified by the evidence, as the residence property has greatly increased in value, not only because of improvements made, but also because of the general rise in value of the village property; and that this farm had not increased in value.

In 1919 plaintiff and her husband were living in Portland, Oregon, and at that time she became the owner of four quarter sections of land in Pierce county and one quarter in Sheridan county. This defendant bank was, during all of the time involved, a sort of a family bank principally owned by J. J. Behrer, his brother-in-law W. E. Daly, and their immediate families, and managed and operated by these gentlemen. In October 1919 the plaintiff came to Martin to take care of her property. She sold one half of the Pierce county land, taking this residence property in Martin as part payment on a trade valuation of $4000.00. On this trip the plaintiff became acquainted with Mr. Daly, frequently consulted with and was advised by him. This real estate transaction was handled through the defendant bank and as the remainder of the purchase price was paid from time to time, the money was deposited in this bank.

The house was originally a one and a half story house made over. At the time of her purchase it had a stone foundation with full basement and was equipped with cistern and pump, and hot water heating plant.

In the spring of 1920 plaintiff came to Martin and made her home in this house. During that summer she sold the Sheridan county land, hereafter known as the Putz land, to Frank and Emil Putz, receiving part cash and promissory notes with security by mortgage on the property for the remainder of the purchase price. This deal was made in the bank, the money deposited there and notes and mortgage left for collection.

The husband of the plaintiff was in the internal revenue service of the United States government and upon being stationed at Cedar Rapids, Iowa, they left Martin in 1920 for that place. In the meantime Messrs. Behrer and Daly continued to be her bankers and to look after her property interests in Martin. The collections made from time to time from the proceeds of her share of crop were deposited in the bank and at times certificates of deposit were issued for the amount, entailing considerable correspondence between her and Mr. Daly in regard to her property interests. In December, 1921, while living at Cedar Rapids, plaintiff wrote to Mr. Daly saying, regarding the house, "if you know of any one who would pay $2,000 any kind of terms we would be glad to sell." The house was rented for $100.00 per year and some times was without a tenant.

On July 7, 1922, Mr. Daly wrote (Ex. "E. E.") saying in part:

"We have some land out near the land you sold the Putz boys which we would like to trade for your house in Martin. We could take better care of this house than you can so far away and we believe the land would not be so expensive in the way of taxes and insurance. If you are interested, we will be glad to submit our proposition. . . . "

And again, July 18, 1922, wrote to her (Ex. "A.") in part as follows:

"We have four different pieces of land we are going to submit as trades for your Martin house. We have a 160 acre piece 7 miles south of Kief with about half of it under cultivation. This is subject to a $1,000 mortgage. We will trade you our equity in this piece for your house. There is another 160 acre piece three miles from this Kief land, near the town of Skogmo, with 110 acres under cultivation and subject to a $1,000 first mortgage. We will trade you even up our equity in this piece for your house. Then there is another quarter ten miles south of Anamoose with about 80 acres in pasture, *and forty acres under cultivation*. This place has a dandy fresh water spring which supplies the place with an abundance of water. You can have this piece subject to an incumbrance of $700 for your dwelling. You understand none of these places have buildings. *They are just about such land as you sold the Putz boys,* so you can form a kind of judgment of them from that. If any of these interest you as a possible trade for your dwelling we will furnish you the legal description and you can look them up. Then we have a piece—160 acres—in Emmons county. This is clear from incumbrance, and can be fully cropped. Of course we would not trade even in this instance. We would have to have something to boot. This is more expensive land and would come higher, but at that it is a very fine property and well worth your consideration."

To this plaintiff replied by (Ex. "B") saying among other things:

"As a trade for our Martin house we are interested in the quarter ten miles south of Anamoose that has the fresh water spring. You say this place has about 80 acres pasture and 40 under cultivation. What is on the other 40?"

In answer to this Mr. Daly, under date of August 18, 1922, wrote Ex. "C," in part, saying:

"In your letter you mentioned being interested in the land 10 miles

south of Anamoose, and the Emmons county quarter as possible trades for your house in Martin. We will try to describe them more in detail herein.

"The quarter near Anamoose, is described as follows: $E\frac{1}{2}SE\frac{1}{4}$ Sec. 8 and the $N\frac{1}{2}SW\frac{1}{4}$ Sec. 9–149–75 Sheridan county. Eighty acres is fenced as a pasture. There is a fresh water spring on the place—no buildings. *Practically all the remaining eighty acres can be cropped. We did not put in the crop this season; could not get to it.* This is subject to a loan in the amount of $700. If we recall rightly you got $25.00 for your land in this vicinity, but we will figure it say at $20.00 for a basis of calculation. 160 a. figures at $20.00 per acre amounts to $3,200.00 less the $700.00 loan gives us an equity of $2,500.00 in the place. Say we figure your house at $2,000. There would be a difference of $500.00. We will trade you this place for your house and $500 cash. Think this proposition over and look it up if you wish, and let us know what you think of it."

Shortly thereafter plaintiff and her husband moved to Lancaster, Pa. By correspondence between plaintiff and her husband on the one hand and Mr. Daly on the other, the deal was completed whereby the plaintiff traded her residence property in Martin for this quarter ten miles south of Anamoose known as the Fruh land, subject to the mortgage thereon, but without any additional payment to the bank, the defendant throwing off the demand for the $500.00 extra. The bank through Mr. Daly continued to look after the business and property of the plaintiff, and in 1923 Mr. Daly sent her $40.00 for rent of pasture on this Fruh land and later another $10.00 which was the entire income from this land received by her. From the time the plaintiff left Martin in 1920 she lived in Iowa, Pennsylvania, and Washington, D. C. and did not return to North Dakota until July, 1928. As early as 1924 she had begun to wonder why she could get no income from the Fruh land. It is this feature defendant says aroused her suspicions.

In 1928 plaintiff came to Martin to look after her interests and see why this Fruh land had never been cultivated, and why, though the remaining Pierce county land was rented, the Fruh land could not be rented. She asked Mr. Daly to show her the land. Not having the time to do so he gave her some directions from which she tried to locate the land, but could not find it. Owing to a severe lameness she remained

in Martin for three weeks, then immediately drove out and found what she supposed was her land. This land found was under cultivation. On inquiry she learned one B. of Anamoose was renting it. She returned and told Mr. Daly who said it was not an uncommon custom for people to rent lands of non-residents and advised her to go to Anamoose and see B. She did so and there learned this was not the land she owned. B. gave her a plat showing the location of her land. The next day she went to see her land and found it extremely hilly, with huge stones and deep ravines; with apparently 80 acres fenced; with no land broken thereon; none under cultivation; and with an entirely different topography from the Putz land.

She returned to Martin, went to the bank and told them she "had been stung." She wanted the bank to trade back, stating that the land was not as represented in the letters. Having left her correspondence in Washington she was permitted by the bank to see some of the correspondence. Without leave she took this correspondence and went to consult an attorney at Valley City. In August this action was commenced.

The undisputed testimony shows that in the letters written by Mr. Daly and set forth herein, there were at least four untrue statements.

(1) There were not forty acres under cultivation as stated in Ex. "A." No part of the land was under cultivation. Mr. Fruh, who had filed on the land, testified that at one time he had broken two strips of land amounting in all to about ten acres. He proved up in 1912 and left the land in 1920, but this ten acre patch had not been cultivated for some time and had gone back to prairie.

(2) It was not true that practically all of the remaining eighty acres—the eighty acres not in pasture—could be cultivated as stated in Ex. "C;" unless the ravines could be filled up and the rocks removed. One witness, testified the stones were so large they could not be removed by team.

(3) It was not true to say, as was said in Ex. "C," "We did not put in the crop this season; could not get to it." The crop was not put in; but it was not because they could not get to it but because there was no land to put in—that is no cultivated land.

(4) It was untrue to say, as was said in Ex. "A," "this land is just about such land as you sold the Putz boys." If by this statement

the writer meant to describe the character of soil as to whether it was sandy or otherwise, even then it was not a true description, because though there were some stones upon the Putz land, yet according to the great weight of the testimony in this case it was rocks that were on the Fruh land. If the writer had in mind the topography of the land then it was clearly untrue for it is undisputed the Putz land had one hill on the northeast corner and one on the southwest corner and the remainder of the land was what was termed rolling. This Fruh land had deep ravines and cuts running through it so that there was no similarity in the topography of the two quarters. The plaintiff had sold the Putz land two years before for $4,000.00, no part of which was trade. She had a right to believe Mr. Daly meant what he said when he stated this and other lands offered were "just about such land as you sold the Putz boys," especially when, in the same letter, he said regarding land in Emmons County offered. "This is more expensive land and would come higher." To accentuate this belief in his statement she had also the plain intimation that she would be required to pay the mortgage of $700.00 and give $500.00 besides.

There is conflict in the testimony as to the value of the Fruh land at the time it was sold. Three disinterested witnesses said the land was worth not to exceed $5.00 per acre at the time it was traded, being fit only for pasture purposes and then only to him who had a neighboring farm. Mr. Behrer testified the land was worth $2,000.00, Mr. Daly $2,200.00, and two disinterested witnesses said $2,000.00 and $2,-500.00. However Mr. Daly said later he figured the actual value as but $1,000.00 but that the house was worth only $1,000.00. There was ample testimony for the jury to believe that the land was worth very little.

The defendant says: "It would be ridiculous for her to believe that he was giving her property valued at four thousand dollars for property which she herself had offered to sell at any terms for two thousand dollars and that party knowing such to be the case." But it must be remembered this $4,000.00 valuation is reduced by the $700.00 mortgage and the $500.00 "boot" demanded, showing even at the Putz valuation a real equity to her of $2,800.00 for her house taken in at $4,000.00 on a land deal. It is true she succeeded in getting Mr. Daly to recede from the demand for $500.00 "boot," but his figuring, as set

forth in Ex. "C," where he tells her she got $25.00 per acre for the Putz land—"your land in this vicinity"—was not for "trading" purposes though there was an exchange suggested. He figured the Fruh land at $20.00 per acre,—the "trading" value being at the Putz' figure, $25.00—knowing the "trading" value of her house to be $4,000.00, but setting the consideration for the house at $2,000.00, considered the actual value. It is true that on the trial one witness for the defendant said the house was worth only $900.00 at that time, but another witness for the defendant set $1,500.00 and $2,000.00 as the actual value at that time.

There is some question as to whether Mr. Daly knew in fact the land was not as he described it. He seems to have relied upon the statement of someone else. However, it was land which belonged to the bank of which he was the assistant cashier, it was situated not far from Martin, and the bank had owned it for some time. The defendant says the evidence shows that even if the statements made by Mr. Daly in the exhibits set forth were not true yet he believed them to be true, and that there is nothing to indicate he did not suppose them to be true. Our statute, § 5849 of the Compiled Laws, says: "The positive assertion in a manner not warranted by the information of the person making it, of that which is untrue, though he believes it to be true," if made by a party to a contract or with his connivance with intent to induce the other party to enter into the contract, constitutes actual fraud. The court submitted this matter to the jury specifically and the jury had before it the information Mr. Daly said he had, and which he claimed warranted his statement. This consisted of rather vague statements by Mr. Behrer, without any personal investigation on the part of Mr. Daly himself. "An unqualified statement of that which one does not know to be true is equivalent to a statement of that which one knows to be false." Comp. Laws, § 9373. Reckless statements which he did not know to be true must be charged against the bank, the same as if he knew them to be untrue.

There is no question but what the plaintiff relied upon the statements and had a right to rely upon them. Defendant says Mr. Daly invited the plaintiff to investigate for herself and as she did not investigate she has not any right to claim a reliance upon his statements. It will be noted there is nothing in this case to show that it was reasonably

apparent to the plaintiff that the knowledge she had at the time could charge her that the statements made by Mr. Daly were untrue. In such case she had "a right to rely upon them and is under no obligation to investigate before doing so." Emanuel v. Engst, 54 N. D. 141, 208 N. W. 840. This applies "where a seller of land makes material representations as to the quality and character thereof intending that such representations shall be relied upon by the buyer." Ibid. As stated in Warne v. Finseth, 50 N. D. 347, 195 N. W. 573, "Ordinarily, one who buys property has a right implicitly to rely upon representations of the seller; and if they were false and made with intent to deceive the purchaser the seller will not be allowed to urge that the buyer, by investigation, could have discovered their falsity." See also Guild v. More, 32 N. D. 432, 155 N. W. 44; Fargo Gas & Coke Co. v. Fargo Gas & E. Co. 4 N. D. 219, 37 L.R.A. 593, 59 N. W. 1066. It is true she had no acquaintance with Mr. Daly until she came to Martin, but their business relations were quite full and very satisfactory and there was nothing in these to create suspicion in her mind regarding the reliability of Mr. Daly.

Just as there was difference in opinion in regard to the value of the land at the time of the trade so there is difference of opinion in regard to the value of the house. It is true she took it at a valuation of $4,000.00 a short time before, but this was on a land deal. In her letter she offered to let it go for $2,000.00. One witness testified that it was worth not to exceed $900.00, another said $1,000.00 and another witness for defendant placed a valuation at $1,500.00 to $2,000.00. Of course the plaintiff places a higher valuation on it. There was ample evidence before the jury to place the valuation of the farm land at a low figure, and the valuation of the house at a relatively high figure and to sustain the special verdict as to fraud and misrepresentations, and their effect. Thus there was no error on the part of the court in adopting this special verdict and findings of the jury.

It is the claim of the defendant that such fraud as claimed must be established by evidence which is clear and convincing, and that this quality is not present. There is a difference between quality and quantity of evidence. So far as quantity is concerned "a preponderance of the evidence taking into consideration all presumptions arising under the circumstances as shown is sufficient to establish fraud so as to void

a written instrument." Rokusek v. National U. F. Ins. Co. 50 N. D. 123, 195 N. W. 300. See also Guild v. More, supra. As to the quality, it is sufficient to say the court instructed the jury as to its rights, stated the fraud "must be clearly proven to entitle the party to relief on the ground that it (the deal) has been fraudulent; and the presumption of law is that business transactions by every man are done in good faith, and for an honest purpose; and everyone who alleges that such acts are done in bad faith or for a dishonest purpose, takes upon himself the burden of proving the allegations so made by a preponderance of the evidence."

The other findings of the court objected to are based upon the verdict of the jury. The court found: that all of the Putz land could be cultivated except 20 acres which was "somewhat rolling and rough," and where "a considerable amount of rock had to be dug and removed;" that the land received for the house was worth about the sum of $1,200.00 and "was valuable only for pasture purposes;" that plaintiff never learned "of the real nature and character of said land until the summer of 1928 when she made a trip from Washington, D. C. to Martin, North Dakota, to look after selling and disposing of such land;" that the defendant bank had caused certain improvements to be made "upon the house" after the trade and that the value of these improvements was "$1,378.92 and that the bank had also collected the rents therefrom amounting to $920.00 and had paid the taxes and kept up the insurance." These are said by the defendant to be error. We can find no error therein. It is undisputed the court was right in describing the Putz land. The valuation the court put on the Fruh land at the time of the trade, has ample support. There can be little dispute as to the finding regarding plaintiff's knowledge. She relied on Mr. Daly's statements, and had a right to do so. She was away from the neighborhood all the time from five hundred to eighteen hundred miles and had no one to consult. There was no apparent reason for consulting any one else. It is true, as defendant says, she began in 1924 to wonder why the land was not being rented, but the description of conditions in this State, as given by Mr. Daly prevented the rise of suspicions. When she had a conviction something was wrong she came to Martin.

The court allowed the bank every dollar which it claimed for improvement. A great deal of this claimed improvement was mere

estimate, with no vouchers of any kind to substantiate it. The officers of the bank together with members of their families had spent time in putting in trees, shrubs and bulbs, building a tennis court and so forth, placing a valuation on their own labor. The court allows the value at which they placed it. The members of the family also did some painting and kalsomining. The court allowed what was claimed as the value of this labor. Even for material furnished such as paint, lumber, where there were no vouchers whatever for the material, the court allowed what the defendant asked. For example, there was a charge of $14.00 for kalsomining some rooms and the hall upstairs. Just about the time of trial, when it was necessary to show the amount of improvements Mr. Behrer said: "I went to two different fellows because I could not find how we paid that, but I know that it was done." He asked them to give him a low estimate. He gave their statements. Of course it was a hearsay testimony, but the court allowed this and all the other numerous items of the same character. For example, when he was questioned about a charge of $200.00 for installing some plumbing and asked to whom he paid the labor cost he said "that was an estimate on the labor on there; I done a good share of that work myself." When asked if he estimated that was the cost he said that he would "defy anybody to put it in for less." There was nothing to show the defendant paid this item of labor and charges to its officials or the members of their families. The court however allowed the amount. As to the charge for rent the defendant itself admitted through its officers that it had received $920.00 in rent. We cannot see how the defendants were prejudiced whatever by this allowance. If any one were prejudiced it was the plaintiff.

It is charged that the amount which the court allows the plaintiff— $413.56—is erroneous.

The amounts as set forth in the findings are as follows:

The plaintiff should be and is credited with the following items:

| | |
|---|---:|
| Principal and interest of land mortgage paid by plaintiff Jan. 5, 1923 | $720.07 |
| Interest on same to date at 6%, 6 yrs. and 5 mo. | 277.20 |
| Taxes paid on land by plaintiff 1922 to 1928 | 218.88 |
| Rent collected by defendant from Martin property | 920.00 |
| | $2,136.15 |

The plaintiff should be charged against this the following:

| | |
|---|---|
| Rent received by plaintiff for farm land .............. | 50.00 |
| Taxes paid by defendant.on Martin property ........... | 208.27 |
| Insurance paid on Martin property .................. | 85.40 |
| Value of improvements placed on Martin property by defendant ...................................... | 1,378.92 |
| | $1,722.59 |

That there is a balance due plaintiff upon this amount of    $413.56

There is no question but what the plaintiff paid the principal, and interest on the mortgage, paid the taxes, and received only $50.00. It is also clear the defendant paid the taxes on the residence property and the insurance, and collected $920.00 rent. In addition it is allowed the doubtful amount of $1,378.92 for the value of the improvements. The defendant has no cause for complaint in being required to account to the plaintiff for the difference as found by the court.

No prejudicial error being shown the judgment.is affirmed.

BURKE, Ch. J., and NUESSLE, BIRDZELL, and CHRISTIANSON, JJ., concur.